## STANDARD SEWING-MACH. CO. v. LESLIE.

(Circuit Court of Appeals, Seventh Circuit. February 11, 1897.)

### No. 345.

1. PAROL EVIDENCE—CONSTRUCTION OF CONTRACT.
   Evidence of the situation of the parties, the subject-matter of the contract, and the circumstances under which it was entered into cannot authorize a construction which would make it conform to what the parties may have secretly intended, but failed to express, but only to explain the terms actually employed, if the language is of obscure or doubtful meaning.

2. CONSTRUCTION OF CONTRACT—PATENT RIGHTS.
   By a contract between a patentee of rotary shuttle sewing machines and a corporation, the patents were to be vested in a trustee; the corporation was "immediately to engage in and carry on with energy the business of making and selling sewing machines during the life of the contract, and shall make such number of machines as to keep the supply as nearly as practicable up to the demands of the trade"; the contract was to endure during the life of the patent, unless terminated by the corporation by giving written notice; the corporation was to pay a fixed royalty "upon each machine manufactured by it embodying the principles covered by the first party's patent," but was not obliged "to make rotary shuttle sewing machines like any model that

has been or may be construed [constructed] or settled upon as a standard, but it may from time to time make such changes as may seem to it expedient," but no such alteration was to relieve it from paying royalties so long as the machine involved "any of the essential principles" covered by the patent; the corporation was to make monthly statements "of the number of said machines shipped from the factory," and make settlements accordingly; it was expressly stated that the patentee did not guaranty the validity of the patents; and the royalties were to cease whenever the patents should be decreed invalid by a court of competent jurisdiction. *Held,* that the corporation was not restricted to the manufacture of machines embodying the principles of the patent, or bound to pay royalties on all machines made, whether covered by the patent or not, so long as it did not terminate the contract by written notice, but was required only to make and pay royalties on machines sufficient to meet the demands of the trade for that machine, and that in an action for royalties it was entitled to show that the machines made and sold did not embody the principles of the patent.

In Error to the Circuit Court of the United States for the Northern District of Illinois.

The defendant in error, Arthur M. Leslie, brought an action in assumpsit against the plaintiff in error, the Standard Sewing-Machine Company, formerly the Leslie Sewing-Machine Company, upon the following contract:

"Whereas, Arthur M. Leslie and the Leslie Sewing-Machine Company, both of the city of Cleveland, Ohio, did upon April 1, 1884, enter into a contract touching the use of certain letters patent for improvements in sewing machines, under which contract said Leslie assigned to Charles H. Bulkley, as trustee to hold for both parties during the continuance of said contract, all his right, title, and interest in and to all United States letters patent which had been granted said Leslie for improvements in sewing machines, and all patents held by him on the rotary shuttle sewing machine, which said letters patent said trustee now holds in trust as aforesaid; and whereas, said parties wish to rescind said contract, and enter into a modified agreement in relation to the subject-matter thereof: Now, therefore, this agreement made this August 20, 1884, by and between said Arthur M. Leslie of the first part and the Leslie Sewing-Machine Company of the second part, witnesseth: (1) Said original contract of April 1, 1884, shall be, and the same is hereby, rescinded and canceled. (2) Said Charles H. Bulkley shall continue to hold said letters patent assigned to him by said first party in trust for the parties hereto under and in accordance with the terms of this agreement. Said first party further agrees to convey to said Bulkley upon the same trusts all letters patent which have been since said assignment, or which may hereafter be, granted to him for improvements on rotary shuttle sewing machines, and all improvements made or which may be hereafter made thereon. In case of the death of said Bulkley during the continuance of this agreement, the interest theretofore vested in him as such trustee shall be vested in such trustee as the then probate judge of Cuyahoga county shall appoint upon application of either party with notice to the other, and thereupon all the stipulations of this contract shall be carried out by the parties hereto as though no change had been made. (3) Said first party agrees to permit second party to take out such foreign patents as it may desire on said rotary shuttle and improvements (the invention of the first party) at any time made thereon, at the expense of second party, and all such foreign patents shall be the joint property of the parties hereto. (4) In consideration of this contract and of past services rendered by first to second party, second party hereby releases first party from all his existing indebtedness to it. (5) Second party hereby agrees to pay first party as royalty the sum of seven and one-half (7½) cents upon each machine manufactured by it embodying the principles covered by the first party's patent up to the number of one hundred thousand (100,000), and the sum of five cents (5) upon each such machine in excess of said number, said, machines to be counted for this purpose on their shipment from the factory. Said royalties shall be paid in cash, and one thousand dollars ($1,000) thereof paid in advance to said first party. (6) Said first party shall not be held to guaranty the validity of said patents or any of them, or to protect said second party against infringement thereof, or against actions brought against it for infringements, but

all royalties hereunder shall cease upon the date of a decree of any court of competent jurisdiction declaring the invalidity of said patent or patents. (7) Said second party agrees immediately to engage in and carry on with energy the business of making and selling sewing machines during the life of this contract, and shall make such number of machines as to keep the supply as nearly as practicable up to the demands of the trade, and this contract shall endure during the life of the patents issued in 1882, unless sooner terminated as hereinafter provided. (8) Said second party shall not be obliged to make rotary shuttle sewing machines like any model that has been or may be construed [constructed] or settled upon as a standard, but it may from time to time make such changes as may seem to it expedient; but no such alteration or change shall relieve second party from the payment of royalties as hereinafter provided, so long as the machine made by it involves any of the essential principles covered by the patent of the first party. (9) Second party shall render to first party once in each month a correct and true statement under oath of the number of said machines shipped from the factory, and make settlements of royalties with first party as follows, to wit, on October 1, 1884, and quarterly thereafter; and first party shall have the right to examine the books of the company on the 1st days of October, January, April, and July of each year during the continuance of this contract to satisfy himself as to the correctness of such monthly statements. (10) Second party shall have the exclusive right to make and sell machines under said patents as above provided during the term of this agreement. (11) Second party may terminate this contract upon giving written notice to the first party, and notifying said trustee that it has no further interest in said patents, and that the same may be reassigned to first party. In witness whereof said parties have hereunto set their hands at Cleveland, O., the day and year above written. Leslie Sewing Machine Company,

"By E. H. Hary, Sec. and Tr.

"By Frank Mack, President.

"Arthur M. Leslie."

At the trial it was proven that the $1,000 specified in the fifth clause of the contract had been paid, but that no other moneys for royalties had been paid. It was further proven that the plaintiff in error had manufactured 179,591 sewing machines between the date of the contract and the bringing of the action, which machines were like one or another of five models produced to the jury; and the plaintiff below offered expert testimony, which was received, tending to prove that each of the five models produced to the jury embodied some one or more of the principles contained in one or more of the patents issued to the defendant in error. The plaintiff in error, defendant below, gave evidence tending to prove that no "Leslie" machines were made by it after September 1, 1885, but only such as were known as the "Standard" machines; and thereupon called as witnesses certain mechanical experts, duly qualified as such, and propounded to each the question, in substance, whether the essential principles of the claims of the patents to Leslie, or any of them, were involved in the machines so manufactured by the company. The trial court, without objection by the plaintiff below, ruled the question to be immaterial, to which ruling a timely exception was made and duly preserved. In connection with that question it was proposed to prove by such witnesses that none of the machines manufactured, shipped or sold by it since January 1. 1887, involved the essential principles of any of the claims of the patents to Leslie, either in identical construction or by way of mechanical equivalent. This offer was ruled against by the trial court, and timely objection to such ruling was made and preserved. The defendant below further offered to prove that at the time of the contract in suit, and for a long time prior thereto, the Leslie machines made in accordance with the plaintiff's patent were unsuccessful in their operation, unpopular with the trade and the public, and that the business of their manufacture and sale had constantly dwindled, and that practically the business was at the point of failure when the contract was made. This offer was ruled against by the court, and an exception duly made and preserved. Many requests to charge with respect to the construction of the contract were preferred to the court and refused, but need not be here specifically stated.

The trial court charged the jury as follows: "My interpretation of that contract being that it was the duty of the defendant, if it chose to cease operations under that contract, to manufacture sewing machines under the patents or some of the patents owned by the plaintiff, it should exercise that option under the eleventh

clause of the contract by serving notice and surrendering to the plaintiff the patents, or authorizing the trustee to surrender the patents to the plaintiff. It being entirely undisputed here in the evidence that there was no such action by the defendant, and it being undisputed that the defendant proceeded in the manufacture of sewing machines to an amount shown by the undisputed testimony, it is the view of the court, and you are so instructed, that the plaintiff is entitled to recover the royalties provided in the contract on the machines which are so shown to have been made; that is, on all of the machines shown to have been made by defendant under the testimony, without regard to variations appearing in the form of the machines as shown by the testimony,"—to which charge an exception was duly made and preserved. The court thereupon directed a verdict for the plaintiff below for royalties according to the contract upon all machines manufactured by the defendant. Such verdict was rendered, and judgment entered thereon, and a writ of error sued out to review the judgment.

Charles S. Holt, for plaintiff in error.

William Prentiss, for defendant in error.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

JENKINS, Circuit Judge, after this statement of facts, delivered the opinion of the court.

It is undoubtedly true that proof of the circumstances out of which the contract grew, and which surrounded its adoption, may be proven to ascertain its subject-matter and the standpoint of the parties in relation to it, where the language of the contract is obscure or doubtful; but such evidence cannot be received to vary the contract by addition or substitution. West v. Smith, 101 U. S. 263–271; Union Stock-Yards & Transit Co. v. Western Land & Cattle Co., 18 U. S. App. 438, 453, 7 C. C. A. 660, and 59 Fed. 49. Possibly, under the doctrine of these cases, the trial court should have entertained the evidence with respect to the situation of the parties, the subject-matter of the contract, and the circumstances under which it was entered into. We need not, however, pause to consider this question, because such evidence could not avail to a construction of the contract which would conform it to what the parties may have secretly intended but failed to express, but only to explain the meaning of the words actually employed if the language used was of obscure or doubtful meaning. We find the instrument in question to be couched in plain and unambiguous language. It is therefore the best possible evidence of the intent and meaning of the parties. The provisions are not antagonistic, nor is the language obscure. There is, as we read the contract, no uncertainty whatever in respect to the object and extent of the engagement. We are therefore to look to the terms of the contract to ascertain the intention of the parties, and that we must find "from the entire contract, without ignoring or forcing from their true significance the plain and unequivocal words and expressions of other articles." Bast v. Bank, 101 U. S. 96; Crimp v. Construction Co., 34 U. S. App. 598, 606, 18 C. C. A. 595, and 72 Fed. 366, 371.

The defendant in error, the inventor of the patented improvements, manifestly desired to provide for the manufacture and sale of machines embodying the features of his inventions. It is mat-

ter of common knowledge that for many years sewing machines of many and different modes of operation had been in use and were upon the market, so that it was questionable whether, in the then state of the art, improvements could be effected which could be properly classed within the domain of invention or be deemed other than mechanical equivalents. Leslie was unwilling to guaranty the validity of his patented inventions, or to protect the company against liability in their use should they prove to infringe upon another's protected rights. This risk was assumed by the company, upon the condition, however, that the payment of royalty should cease when a competent court should declare the invalidity of the invention. It thus appears that the inventions of Leslie were not recognized to be of established merit, or to be such that a monopoly in their use was assured to the company. It was clearly, therefore, an adventure of doubtful outcome, depending in part upon the question whether a monopoly in the manufacture and sale of these inventions should be established, and therefore uncertain whether their manufacture and sale would prove remunerative. It was under these circumstances that this contract was made. We therefore naturally find that those who were to invest capital in their manufacture should seek to protect themselves, so far as possible, against the risk assumed, by providing, as is done in the sixth clause of the agreement, that all royalties should cease upon the date of the decree of any court of competent jurisdiction declaring the invalidity of such patent or patents, and also by providing, as is done by the eleventh clause, that the company might terminate the contract at any time upon written notice, thereupon relinquishing all interest in the patents which had been assigned to a trustee in trust for the purposes of the contract. The company was willing to assume the risk of infringement upon other patented rights until the invalidity of the patents was declared, if payment of royalty should thereupon cease, and it had also the right to terminate the contract. This eleventh clause furnished the company another protection. Although the patents might be sustained, it was still problematical whether the inventions were such as to commend themselves to popular favor, and whether the manufacture and sale of machines embodying those inventions would prove pecuniarily remunerative. The company chose to bind itself to the manufacture of the Leslie machine during the terms of the patents, but reserved to itself the right to terminate the contract at any time when it deemed it advisable so to do.

By the seventh clause the company agreed "immediately to engage in and carry on with energy the business of making and selling sewing machines during the life of this contract, and shall make such number of machines as to keep the supply as nearly as practicable up to the demands of the trade, and this contract shall endure during the life of the patents issued in 1882, unless sooner terminated, as hereinafter provided." It is insisted for the plaintiff in error that this provision has reference to the making and selling of sewing machines generally, and is not limited to the man-

ufacture of those conforming to the Leslie patent, and that the company was bound to manufacture sewing machines of different designs sufficient practically to supply the needs of the market, so that Leslie's inventions, if they should prove popular and valuable, might find a larger market. We think this a strained and unwarranted construction of the contract. We are unable to understand that the flooding of the market with machines of different construction could be beneficial to the marketing of Leslie's machine. Upon the contrary, it would be detrimental. Leslie was only concerned to supply the market with machines containing his own invention, not the devices of others. It was not only foreign to his purpose, but counter to his interest, to supply the market with other and competing manufactures. The limitation of the contract to the period of the life of the patent lends additional force to this construction, if any support were needed. The plain meaning of the compact is that the company should energetically pursue the manufacture of the Leslie machines so that the supply should not fall short of the demand for these machines. It does not follow, however, if there were a breach of the agreement in this respect,—which we do not understand to be charged,—that the damages arising from the breach are measured by the amount of royalty specified in the contract to be laid upon all machines made by the company. That is to say, if the company was prohibited to manufacture machines other than the Leslie machines, and violated its contract in that regard, we do not understand that the company would be liable to respond for the specified royalties upon all the machines they manufactured, because it does not follow, necessarily, that the company could have sold the Leslie machine to the extent that they might have sold machines of other character and embodying other inventions. We cannot, however, find in this contract any language or any intent to restrict the company to the manufacture and sale of Leslie machines. It is true the company agreed to carry on energetically the business of manufacturing Leslie machines sufficient to supply the demands of the market. That manufacture might be great or small, according to the popularity which the Leslie machines might attain, and according to their merit, as might be established by their practical use, and as the validity of the patents might be determined by the court. It is not to be assumed, in the absence of restrictive provisions, that the company bound itself to invest considerable capital in a manufacturing plant which must lie idle unless the Leslie machine should prove to be a valid monopoly and entitled to and obtain popular indorsement and demand. The company was indeed bound to manufacture the Leslie machine up to the demand of the market, but beyond that it was not restricted in the use of its plant. We not only do not find in this contract any word of exclusion or prohibition in this regard, but we discover language which, to our thinking, clearly recognizes this right. Thus, in the fifth clause of the contract the royalty is laid upon each machine manufactured by the company "embodying the principles covered by the first party's pat-

ent"; and in the eighth clause it is provided that the company shall not be obliged to make rotary shuttle sewing machines like any model that had been settled upon as a standard, but it had the right to make such changes as should seem to it expedient, provided that no such alteration should relieve the company from the payment of royalties as provided, "so long as the machine made by it involved any of the essential principles covered by the patent of the first party." Unless, under this contract, the company could rightfully make machines other than Leslie machines, this language is meaningless. If, as ruled below, the company must pay royalties upon all machines made by it so long as the contract was operative and until it was canceled by the act of the company, the language of these two clauses fulfills no office. These provisions are, then, mere surplusage. We have no right to so regard them. We must disregard a cardinal canon of construction to expunge them or to ignore them. They are not in conflict with any other term of the contract. They must be given full effect. That can only be done, in the absence of any words of exclusion or prohibition, by holding that the company had the right to engage in the manufacture of machines other than the Leslie machine. The provisions of the ninth clause clearly relate to a statement of the number of Leslie machines shipped, and not to those of another character, for Leslie was only interested in royalties upon machines manufactured according to his patents.

We fail to perceive the force of the interpretation of the trial court that it was the duty of the company, if it chose to cease operations under the contract and the manufacture of sewing machines under the patents owned by Leslie, to first exercise its option under the eleventh clause to terminate the contract. Undoubtedly, so long as the contract continued in force, the company was bound to manufacture the Leslie machines sufficient to meet the demands of the trade in that machine, but this does not prohibit the company from the manufacture of machines under other patents or of different construction; for to hold that, as we have before observed, would be to fly in the face of the express language of the fifth and eighth clauses of the contract. The company could terminate the contract whenever it found the business unremunerative, but, the contract continuing, it must meet the market demand for the Leslie machine. To the objection that under such construction the company could retain the exclusive control of the patents while refusing to supply the market demand for the Leslie machines, it may properly be answered that for such breach of the agreement the company would be answerable in damages, and if the remedy at law were inadequate equity would find a way, possibly by annulling the contract and compelling a reconveyance of the patents, to stay the threatened wrong. Courts of law, however, do not sit to relieve from improvident contracts, but to interpret and enforce the agreements which parties have themselves made. We are of opinion that the trial court erred in its exclusion of evidence which would tend to show that the machines manufactured did not involve any of the essential principles covered

by the Leslie patents and in its direction of a verdict. The judgment will therefore be reversed, and the cause remanded, with directions to the court below to award a new trial.